UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
www.flsb.uscourts.gov

In re:

CINEMEX HOLDINGS USA, INC.,
CMX CINEMAS, LLC, and CB
THEATER EXPERIENCE LLC,[1]

Debtors.
_____/

Chapter 11 (Subchapter V)

Case No. 25-17559-LMI

(Jointly Administered)

**DECLARATION OF RAFAEL MUÑOZ PEDREGAL IN SUPPORT OF
SUBCHAPTER V PETITIONS AND FIRST DAY MOTIONS**

I, Rafael Muñoz Pedregal, submit this declaration pursuant to 28 U.S.C. § 1746 ("Declaration") in support of the Subchapter V Petitions (as defined below) and First Day Motions (as defined below) for Cinemex Holdings USA, Inc. ("Cinemex Holdings"), CMX Cinemas, LLC ("CMX Cinemas"), and CB Theater Experience LLC ("CB Theater" and, together with Cinemex Holdings and CB Theater, the "Debtors" or "Cinemex"), and state as follows:

1. I am the President and Chief Executive Officer of the Debtors since November 2024. I have extensive experience in both finance and operations at the executive level. Over the course of my career, I have held key leadership roles, including Chief Financial Officer and Chief Operating Officer at a large nationwide logistics company for more than six years. I also served as Vice President of Finance for a transnational, billion-dollar security and consulting firm, and spent a decade as Deputy CEO of a multinational corporation specializing in security and intelligence.

---

[1] The Debtors in these cases and the last four digits of each Debtors' federal tax identification number are as follows: (1) Cinemex Holdings USA, Inc. (5502); (2) CMX Cinemas, LLC (1938); and (3) CB Theater Experience LLC f/k/a Cobb Theater Experience LLC f/k/a Cinemex NC, LLC (0563). The address for the Debtors is 4300 Biscayne Blvd, Suite 203, Miami, FL 33137.

1

4909-3984-5202, v. 1

Additionally, I have over five years of experience in the movie theatre industry. I hold a Bachelor's degree in Business Administration with a specialization in Finance, a Master's degree in Finance, and have completed further specialization studies in Accounting and Corporate Finance.

2. On June 30, 2025 ("Petition Date"), the Debtors filed for bankruptcy under subchapter V of chapter 11 of title 11 of the United States Code ("Subchapter V," and "Bankruptcy Code") in the U.S. Bankruptcy Court Southern District of Florida (the "Court," and the "Subchapter V Petitions").

3. Cinemex intends to operate its business and manage its assets as a debtor-in-possession as defined under the Bankruptcy Code.

4. To minimize the adverse effects of the Subchapter V cases (the "Subchapter V Cases"), Cinemex has prepared and filed, with the assistance of its bankruptcy counsel, motions and applications discussed in this Declaration seeking "first day" relief (collectively, the "First Day Motions"). Through the First Day Motions, Cinemex seeks authority from the Court to allow it to continue to do certain things, such as use its existing bank accounts, that are necessary to ongoing operations and to enable Cinemex to fulfill its duties as a debtor-in-possession.

5. I am familiar with the contents of the First Day Motions and, to the best of my knowledge after reasonable inquiry, believe that the relief sought in each First Day Motion: (i) is necessary to enable Cinemex to transition smoothly into Subchapter V with minimal disruption; (ii) is critical to Cinemex's efforts to preserve its value and maximize creditor and stakeholder recoveries; and (iii) best serves Cinemex's estate and the interests of its employees, creditors and stakeholders. Further, it is my belief that the relief sought in the First Day Motions is tailored and necessary to achieve the goals of the Subchapter V Cases.

6. Except as otherwise indicated, the facts set forth in this Declaration are based upon (i) my personal knowledge of Cinemex's business operations; (ii) my review of relevant Cinemex business records; and (iii) my review of other information provided to me or verified by other executives or employees of Cinemex under my direction and control. Unless otherwise indicated, the financial information contained in this Declaration is unaudited and, due to the exigent circumstances facing Cinemex and the need to file these Subchapter V Cases, certain of the information contained in this Declaration is subject to change. Notwithstanding, I am not aware of any information contained in this Declaration that is inaccurate.

7. I submit this Declaration in support of Cinemex's (i) Subchapter V Petitions; and (ii) the First Day Motions. I am personally knowledgeable about, and familiar with, the business and financial affairs of Cinemex and am authorized to submit this Declaration on behalf of Cinemex. If called upon to testify, I would testify that the facts set forth in this Declaration are true and correct.

## PRELIMINARY STATEMENT

8. Cinemex is in the movie theater business. In terms of organizational structure, Cinemex Holdings (which was incorporated in Delaware in 2014) is the entity that holds CB Theater (incorporated in Delaware in 2017) and CMX Cinemas (incorporated in Delaware in 2020). Cinemex is based in Miami.

9. Cinemex operates twenty-eight movie theaters in dozens of cities in eight different states, including Florida (with multiple theaters in South Florida), Alabama, Georgia, Illinois, Minnesota, North Carolina, Ohio, and Virginia. The theaters operate under the brand names "CMX Cinemas" and "CMX CinéBistro."

4909-3984-5202, v. 1

10. Since mid-March 2020, the unprecedented worldwide COVID-19 pandemic has not stopped to substantially and adversely affect Cinemex and its operations, like many other movie theater operators.

11. Due to detrimental effects of the COVID-19 pandemic (which caused the shutdown of all movie theaters and the furlough of almost all of Cinemex's workforce), Debtors Cinemex Holdings and CB Theater and non-Debtor Cinemex USA Real Estate Holdings, Inc. ("Cinemex Real Estate") (collectively, the "Reorganized Debtors") filed for chapter 11 protection before this Court on April 25 and 26, 2020 (the "2020 Bankruptcy"). On November 25, 2020, the Court confirmed the *Third Amended Joint Plan of Reorganization of Cinemex USA Real Estate Holdings, Inc., Cinemex Holdings USA, Inc. and CB Theater Experience LLC* [Case No. 20-14695, Docket Nos. 772 and 936] (the "Plan"). The Plan was a reflection of the Reorganized Debtors' post-petition efforts to reorganize their business through a sale of their assets (the "Asset Sale"). The Asset Sale entailed the sale of Cinemex Holdings' common stocks to Wine and Roses, S.A. de C.V. ("Wine & Roses"), which was at the time an affiliate of the Debtors because both Wine & Roses and the Debtors were affiliates of Entretenimiento GM de Mexico S.A. de C.V. ("Entretenimiento").

12. The long-term effects of the COVID-19 have, however, continued to undermine Cinemex's business after the Plan's confirmation. Attendance levels at the movie theaters have remained significantly below pre-pandemic levels due to a shift in consumer behavior. The foregoing has had a direct and negative effect on box office revenues, as well as on ancillary revenue such as food and beverage sales. Moreover, the explosive growth of streaming platforms has reshaped the movie theater industry, negatively affecting box office revenues. In addition, Cinemex is financially impacted by (i) its lease obligations that were negotiated almost fifteen

4

years ago under market conditions that no longer exist; and (ii) its obligations to pay film studios a set percentage of box office sales on a weekly basis pursuant to master licensing agreements ("MLA[s]") as well as further negotiated terms for particular films issued by each studio.

13. Through the Subchapter V Cases, Cinemex will (i) identify which theaters simply are not profitable, which ones are profitable, and which ones can be profitable; and (ii) seek to renegotiate leases with landlords and revenue-sharing agreements with studios and, in turn, rebalance what has become economically untenable for companies in the movie theater industry. Specifically, the current economic arrangements disproportionately benefit the studios and landlords at the expense of the theater companies. With the filing of the Subchapter V Petitions, Cinemex aims to restructure its business while protecting its employees and emerging in a strong and viable long-term financial condition to continue to serve its customers across the United States and potentially growth its business.

14. To familiarize the Court with Cinemex and the relief sought in the First Day Motions, this Declaration is organized into four parts as follows: Part I describes the history of Cinemex, its corporate structure, business operations, and the 2020 Bankruptcy; Part II provides an overview of Cinemex's assets, liabilities, and financial condition; Part III provides a description of the circumstances leading to the commencement of these Subchapter V Cases; and Part IV provides an overview of the relief requested in the First Day Motions.

I. **OVERVIEW OF CINEMEX'S HISTORY AND BUSINESS OPERATIONS**

   A. **Corporate History and Structure**

15. Cinemex Holdings is the holding company for three U.S. entities: (i) Debtor CB Theater; (ii) Debtor CMX Cinemas; and (iii) Cinemex Real Estate (collectively with Cinemex Holdings, "Cinemex USA"). Cinemex Real Estate did not file a Subchapter V Petition.

16. Cinemex Holdings is owned by Wine & Roses, a Mexican corporation, which is owned by Entretenimiento, which is also a Mexican corporation.

17. Cinemex Holdings and CB Theater are the parties that are the counterparties to MLAs with most of the film studios whose films are shown in Cinemex theaters.[2] In addition, CB Theater is the entity that holds all of the leases for the premises that Cinemex USA leases.

18. CMX Cinemas is the entity that employs personnel and along with CB Theater is responsible for payroll, benefits (such as insurance), and employee-related obligations (such as payroll tax) for all Cinemex USA employees. Prior to filing for Subchapter V, CB Theater paid the expenses due for payroll, payroll taxes, and insurance.

**B.    The 2020 Bankruptcy**

19. On late April 2020, the Reorganized Debtors commenced the 2020 Bankruptcy's proceeding by seeking chapter 11 relief in this Court. The 2020 Bankruptcy cases were jointly administered [Case No. 20-14695, Docket No. 9].

20. Post-petition, the Reorganized Debtors engaged in a dual-track restructuring, pursuant to which they conducted a robust marketing process for some or all of their assets while engaging in negotiations with creditors to reorganize their business under a chapter 11 plan. In early August 2020, the Reorganized Debtors filed a motion for the entry of an order approving bidding procedures for the sale of part or all of the Reorganized Debtors' assets, including new equity in Cinemex Holdings (i.e., the "Asset Sale") [Case No. 20-14695, Docket No. 471]. The Court entered the related (corrected) order on September 2, 2020 [Case No. 20-14695, Docket No. 522]. Wine & Roses made an initial bid that provided consideration sufficient to pay all amounts

---

[2] Under the MLAs, Cinemex typically pays film studios a set percentage of box office sales on a weekly basis, as well as further negotiated terms for particular films issued by each studio. For example, if Cinemex sells $100,000 worth of tickets in a week for a particular film and the arrangement is that the film studio gets 60% of sales, Cinemex must pay $60,000 to the studio for that week.

needed to confirm a plan of reorganization, plus $5 million for all unsecured creditors. Wine & Roses and the Reorganized Debtors then engaged in multiple rounds of negotiations that led to an estimated 15% recovery to holders of non-bank general unsecured claims.[3] The Reorganized Debtors ultimately determined that Wine & Roses' bid was the highest and best bid, and filed the Plan that was premised on the sale of Cinemex Holdings' stocks to Wine & Roses. *See*, *generally*, Case No. 20-14695, Docket No. 936 at pp. 47-48.

21. On November 25, 2020, the Court entered the *Findings of Fact, Conclusions of Law and Order Confirming Third Amended Joint Chapter 11 Plan of Reorganization of Cinemex USA Real Estate Holdings, Inc., Cinemex Holdings USA, Inc. and CB Theater Experience LLC* [Case No. 20-14695, Docket No. 936] (the "Confirmation Order"). Under the Confirmation Order, the Court confirmed the Plan.

22. In addition of being a reflection of the Asset Sale, the Plan provided for the issuance of the—fully paid—*Cinemex Holdings USA, Inc. Theater Level Cash Flow Note Issued Pursuant to Third Amended Joint Chapter 11 Plan of Reorganization* (the "TLCF Note") to Cinemex GUC Claims Trust (the "Trust") that was also created under the terms of the Plan.[4]

23. The Plan went effective on December 18, 2020 [Case No. 20-14695, Docket No. 973].

C. **Cinemex's Business**

24. Cinemex's core business is within a niche market of the movie theater industry called "dining theaters." The concept behind Cinemex is to provide guests with an all-inclusive

---

[3] Wine & Roses' initial bid provided for 2.3% payout to general unsecured creditors.

[4] Regarding the TLCF Note, on June 23, 2025, the Court dismissed the *Complaint for Breach of Contract* in which the Trust asserted that the 2020 Debtors breached the TLCF Note. *See Cinemex GUC Claims Trust v. Cinemex Holdings USA, Inc., et al.*, Adv. Proc. No. 25-1120 (Bankr. S.D. Fla.) at ECF No. 11 (order dismissing complaint).

7

4909-3984-5202, v. 1

going-out experience: guests can dine, drink, and attend a movie by going to a single location. Cinemex thus has fine dining restaurants and bars on site as well as offers guests the opportunity to order food and drinks from their seats during the movie.

25. Furthermore, Cinemex offers state-of-the-art technology such as IMAX, 3D, and surround sound and amenities such as full reclining seats. Most of its theaters are located in shopping malls, while only nine are housed in standalone buildings.

26. Cinemex's long-term strategic objective is to expand the CMX Cinemas brand across the United States and become the leading "dining theater" company. This is because it will likely become more difficult for the traditional industry model—which is to watch a movie with just the option of snacks and drinks, such as sodas and water—to compete with streaming services, which are less expensive and offer the convenience of watching films at any time and from any location. To incentivize guests to watch movies in a theater, Cinemex has focused on creating high-quality restaurants and bars on site and offering luxury amenities such as in-seat dining.

### D. Cinemex's Management Team

27. Apart from myself, Cinemex's management team has deep experience and expertise in the movie theater industry.

28. Guy Austin is the Vice President of Film & Content since 2017. He has over 44 years of experience in the cinema exhibition industry. Mr. Austin started his career at Edwards Theatres back in 1981, quickly escalating from staff to General Manager and eventually Vice President of Operations for several companies in the industry. Today, he maintains studio partner and content provider alliances that are key for the operation of our company.

29. Andrew King is the Vice President of Food & Beverage, a position he assumed in 2021. Mr. King is a Hospitality Industry Professional and Chef with nearly 30 years' experience

in restaurant operations and management. He has over nine years' experience in the cinema exhibition industry.

30. Troy McDaniel is the Vice President of Operations. He joined our company in 2017 and has nearly 42 years of experience in theater operations, with roles such as Director of Operations, Senior Regional Director, Senior General Manager, and Auditor. His career has covered multiple locations across the US in the Southeast and Northeast, where he has focused on strategic planning, operational efficiency, financial management, and team leadership.

### E. Employees

31. Currently, Cinemex USA (through CMX Cinemas and CB Theater) employs approximately 1,400 full- and part-time employees (the "Staff"). The Staff includes, among others: (i) executive- and manager-level personnel working in accounting, finance, operations, human resources, and information technology; (ii) sales clerks; (iii) restaurant and bar personnel (e.g., chefs, waiters, bartenders); and (iv) theater technicians and maintenance staff.

## II. CINEMEX'S CAPITAL STRUCTURE AND MAJOR LEASES

### A. Assets, Liabilities and Revenues[5]

32. As of June 30, 2025, Cinemex, on a consolidated basis, had (i) current assets (e.g., bank accounts, food and beverage in inventory) of approximately $1 million; (ii) other assets in the form of theater leases, equipment, furniture, and intangibles of approximately $123 million; and (iii) liabilities of approximately $15 million (not including intercompany debt of $50 million).

33. Through Q2 2025 (through June 30, 2025), Cinemex, on a consolidated basis, had gross revenues of approximately $61 million comprising (i) $30 million in box office ticket sales;

---

[5] Unless otherwise indicated, the consolidated figures in this section are for the three Debtors only, and exclude the Non-Debtors.

4909-3984-5202, v. 1

(ii) $28 million in food and beverage sales; and (iii) $3 million from other sources (e.g., advertisement sales on movie screens).

34. During the same period, monthly expenditures through Q2 2025 for Cinemex, on a consolidated basis, exceeded $62 million and comprised, among other things, costs for licensing fees to film studios, food and beverage costs, leases and payroll ("Expenses"). While payroll, employee benefits, and payroll taxes are owed almost entirely by CMX Cinemas, all costs have been paid by CB Theater, including until prior to the Petition Date.

35. For the year ending December 31, 2024, Cinemex, on a consolidated basis, generated approximately $129 million in gross revenues, comprising (i) $64 million in box office ticket sales; (ii) $60 million in food and beverage sales; and (iii) $5 million from other sources (e.g., advertisement sales on movie screens). The average monthly net revenues were thus approximately $11 million.

36. In 2024, the total amount of Expenses that Cinemex (on a consolidated basis) incurred was approximately $133 million. The net difference between approximate gross revenues ($129 million) and Expenses ($133 million) was therefore negative and approximately $4 million.

37. Apart from ordinary operating expenses, lease payments, and payments to film studios, Cinemex also paid approximately $8.2 million in costs relating to administration and marketing.

**B.    Secured and Unsecured Liabilities**

38. The Debtors are aware of a secured claim for a promissory note reflecting loans provided by parent Wine & Roses. The asserted collateral for this secured claim consists of substantially all of the Debtors' assets. The approximate value of the asserted collateral securing this claim is $124 million.

39. In addition, CB Theater is aware of three UCC-1 financing statements filed by landlords Old Orchard Urban Limited Partnership, Southgate Mall Owner LLC, and Countryside Mall, LLC with respect to their rights to obtain ownership of various tangible personal property within their leased premises upon termination of their lease agreements with CB Theater (*see* ECF No. 936 in Case No. 20-14695-LMI (Bankr. S.D. Fla.). The approximate value of the property reflected in these UCC-1 financing statements is unknown.

40. At this time, the Debtors are not aware of any other secured claims, other than potential setoff rights or statutory liens not yet filed. These Debtors conducted UCC-1 filing searches with the Delaware Secretary of State, which revealed no other UCC-1 filings.

41. Cinemex's unsecured obligations consist of, among other things, payments due to film studios in licensing fees and payments due to vendors for goods and services.

42. As of the Petition Date, Cinemex estimates that its collective outstanding, non-contingent, and liquidated unsecured obligations totaled approximately $1.9 million (the "Estimated Unsecured Claim Amount").

**III.   EVENTS LEADING UP TO THE SUBCHAPTER V**

    **A.   COVID-19 Pandemic Caused the Commencement of the 2020 Bankruptcy and the Asset Sale to Wine & Roses**

43. As a result of the pandemic stemming from the COVID-19 outbreak and subsequent local, state, and U.S. federal restrictions on social and in-restaurant dining activities, all CMX Cinemas were shut down during approximately 210 days, and one of its Minnesota locations remained closed for 18 months. Consequently, Cinemex (i) was unable to generate revenues during most of 2020; (ii) suffered a lack of liquidity that made it impossible for Cinemex to pay its debts when due; and (iii) Cinemex USA had to lay off all but approximately 30 of its 2,500 employees. The foregoing led the Reorganized Debtors to commence the 2020 Bankruptcy and

11

the related Asset Sale to Wine & Roses. *See*, *generally*, Case No. 20-14695, Docket Nos. 47, 773 at pp. 1-2, 37.

  **B.**  **Causes Leading to the Filing of the Subchapter V**

  44.  The long-term effects of the COVID-19 have, however, continued to undermine Cinemex's business after the Plan's confirmation. Indeed, Cinemex resumed operations almost entirely only in February 2021, and, even then, attendance levels at the movie theaters have remained significantly below pre-pandemic levels due to a shift in consumer behavior. The foregoing has had a direct and negative effect on box office revenues, as well as on ancillary revenue such as food and beverage sales.

  45.  The temporary closing of theaters during the COVID-19 pandemic and the complete halt in productions and delays in film releases led studios to pivot toward streaming-first or simultaneous release strategies, triggering an explosive surge in streaming subscriptions, which doubled to approximately $1.8 billion worldwide and to approximately $340 million in the U.S. market from 2019 to 2025. As a result, many consumers grew accustomed to watching new releases at home, permanently reshaping the movie theatre industry. This shift in viewing habits has had a lasting negative impact on box office revenues. Since 2022, theatrical releases have resumed, but audience attendance remains below pre-pandemic levels. In 2024, the U.S. box office reached $8.7 billion—still 23.5% lower than in 2019. Studios have responded by experimenting with shorter theatrical windows and hybrid release models that combine cinema and streaming, which has further damaged the movie theater attendance.

  46.  Over the past five years streaming platforms have emerged not just as distributors but as major content creators. These platforms (that unlike traditional exhibitors, do not incur any of the fixed costs that burden movie theatres) often release content directly to their subscribers, bypassing theatrical releases entirely and further reducing demand for in-person moviegoing.

Moreover, much of the content produced by these platforms is distributed exclusively online and is never made available for theatrical release. This direct-to-consumer model has not only undermined box office revenue but has made it nearly impossible for traditional exhibitors to compete on a level playing field.

47. Additionally, the 2023 actors' and writers' strikes—led by the Screen Actors Guild – American Federation of Television and Radio Artists (SAG-AFTRA) and the Writers Guild of America (WGA) had a massive impact on the movie and television industry, both economically and creatively. Nearly all major film and TV productions were halted or delayed, including blockbuster movies and popular streaming series. The content pipeline dried up, leading to fewer new releases in late 2023 and early 2024.

48. Compounding these issues are the lease obligations that were negotiated almost fifteen years ago under market conditions that no longer exist and when the industry was far more stable and profitable. Currently, Cinemex spends approximately 22.6% of its annual revenues on lease-related expenses (based on FY 2024 figures). This substantial fixed-cost burden—predicated on foot traffic and ticket-buying behavior of a bygone era severely limits Cinemex's ability to generate a profit.

49. In consequence, since reopening after COVID-19 in 2021, Cinemex has generated, between 2021 and 2024, (on a consolidated basis) gross revenues of approximately $489 million but had costs and expenses totaling approximately over $517 million, which meant that it had approximately $28 million in negative EBITDA. Cinemex made up this shortfall by borrowing money from parent Wine & Roses. Cinemex Holdings, CB Theater, and CMX Cinemas have outstanding loans totaling approximately $50 million in intercompany debt.

## IV. FIRST DAY MOTIONS

### A. Overview

50. Contemporaneously with the filing of this Declaration, Cinemex has filed or expects to file a number of First Day Motions seeking orders from the Court for various relief intended to (i) stabilize Cinemex's business; (ii) facilitate the efficient administration of these Subchapter V Cases; (iii) lessen the impact of the Subchapter V Cases on Cinemex's day-to-day operations and employees; and (iv) facilitate a successful reorganization of Cinemex. The First Day Motions include the following:

- *Debtors' Ex Parte Motion for Order Directing Joint Administration of Related Chapter 11 Cases for Procedural Purposes*;

- *Debtors' Expedited Application for Order Authorizing Employment of Bast Amron LLP as Counsel to the Debtors Effective as of June 30, 2025*;

- *Debtors' Expedited Application for Order Authorizing Employment of Quinn Emanuel Urquhart & Sullivan, LLP as Counsel to the Debtors Effective as of June 30, 2025*;

- *Emergency Application to Approve Employment of Omni Agent Solutions to Serve as Noticing, Balloting, and Administrative Agent for the Debtors Effective June 30, 2025*;

- *Debtors' Expedited Application for Order Authorizing Employment of GlassRatner as Counsel to the Debtors Effective as of June 30, 2025*;

- *Debtors' Emergency Motion for Authorization to (I) Continue to Administer All Insurance Policies and Related Agreements; (II) Continue Certain Related*

14

- *Premium Financing Agreements; and (III) Honor Certain Obligations in Respect Thereof;*

- *Debtors' Emergency Motion for Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services; (II) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Services; (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests; and (IV) Granting Related Relief;* and

- *Debtors' Emergency Motion Pursuant to Sections 105, 345, 364, 363, 503, 1107 and 1108, Authorizing (i) Maintenance of Existing Bank Accounts; (ii) Continuance of Existing Cash Management System, Bank Accounts and Checks and Related Forms; (iii) Continued Performance of Certain Transactions; (iv) Limited Waiver of Section 345(b) Deposit and Investment Requirements; and (v) Granting Related Relief.*

51. The First Day Motions seek authority to, among other things, ensure the continuation of the Debtors' cash management system and other operations in the ordinary course of business with as minimal interruption as possible on account of the commencement of these Subchapter V Cases. In my capacity as President and Chief Executive Officer, and based on my experience and knowledge, I believe that the relief requested in the First Day Motions is necessary to provide the Debtors an opportunity to work towards a successful restructuring that will inure to the benefit of each stakeholder.

52. Certain of the First Day Motions request authority to pay certain prepetition claims against the Debtors. The Debtors have narrowly tailored these requests for immediate authority to pay certain prepetition claims to those instances where the failure to pay would cause immediate

4909-3984-5202, v. 1

and irreparable harm to the Debtors and their estates. The Debtors will defer seeking other relief to subsequent hearings before the Court.

53. I am familiar with the content and substance of each of the First Day Motions and hereby reference and expressly incorporate into this Declaration the facts in each First Day Motion. In my capacity as President and Chief Executive Officer, and based on my experience and knowledge, I believe approval of the relief sought in each of the First Day Motions is critical to the Debtors' ability to successfully implement their Subchapter V strategy, with minimal disruption to their business operations. Obtaining the relief sought in the First Day Motions will permit the Debtors to preserve and maximize the value of their estates for the benefit of all of their stakeholders.

54. I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

*Rafael Muñoz*

Rafael Muñoz Pedregal
President and Chief Executive Officer of Cinemex Holdings USA, Inc., CB Theater Experience, LLC, and CMX Cinemas, LLC